**LOCAL DIVISION 732, AMALGAMATED TRANSIT UNION AFL–CIO, Plaintiff,**

v.

**METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY, Defendant.**

Civ. A. No. C81–1242A.

United States District Court,
N. D. Georgia,
Atlanta Division.

July 17, 1981.

Linda R. Hirshman and Kalman D. Resnick, Jacobs, Burns, Sugarman and Orlove, Chicago, Ill., Clayton Sinclair, Sinclair & Dixon, Atlanta, Ga., and Earle Putnam, Washington, D. C., for plaintiff.

Terrence Croft and Lawrence Thompson, Kutak, Rock & Huie, Atlanta, Ga., for defendant.

## ORDER

SHOOB, District Judge.

Plaintiff, Local Division 732 of the Amalgamated Transit Union, AFL–CIO, filed its complaint and a motion for a temporary restraining order (with a brief in support and attachments) on June 30, 1981. Plaintiff seeks declaratory and injunctive relief against defendant Metropolitan Atlanta Rapid Transit Authority (MARTA). Plaintiff asks this Court: (1) to declare that MARTA's refusal to maintain intact contract conditions, and its unilateral reduction in the wages of employees who are members of the bargaining unit represented by plaintiff, violate § 13(c) of the Urban Mass Transportation Act of 1964, 49 U.S.C. § 1609(c), the 1977 agreement between plaintiff and defendant pursuant to § 13(c), and 42 U.S.C. § 1983; and (2) to enjoin defendant MARTA from changing contract conditions and unilaterally reducing the wages of its employees. More specifically, plaintiff asks the Court to enjoin MARTA from discontinuing the cost-of-living allowances ('COLAs') previously paid to MARTA employees pursuant to §§ 144–46 of the recently-expired labor agreement.[1] Plaintiff does *not*, however, seek any *additional* COLA adjustments beyond those paid when the labor agreement expired on June 27, 1981. MARTA indicated its intention of discontinuing COLA payments in a letter to Local 732 dated June 25, 1980. *See* Letter of Alan F. Kiepper, Exhibit D to the Complaint. Because the first paychecks not including COLA payments to plaintiff's members would not be issued until July 16, 1981, this Court has declined to issue a temporary restraining order and has instead treated plaintiff's application for relief as one for a preliminary injunction.

The Court has heard from both parties in open court, and has taken live testimony as to factual matters in dispute. Further, the Court has had ample opportunity to consider the authorities submitted by counsel. Pursuant to Fed.R.Civ.P. 52(a), the Court now sets forth the findings of fact and conclusions of law which persuaded it to issue this preliminary injunction in open court last Friday, July 10, 1981.

## FINDINGS OF FACT

1. Plaintiff is an unincorporated labor organization representing workers in the transit industry for purposes of collective bargaining. At all times since the creation of MARTA, plaintiff has been the collective bargaining representative for a unit of defendant's employees.

2. Defendant MARTA is a public body organized and existing under the laws of the State of Georgia to provide mass transportation in the metropolitan Atlanta area.

3. MARTA has applied for, and has been given, a number of grants (for both capital improvements and operating assistance) under the Urban Mass Transportation Act. Section 13(c) of UMTA requires transit agencies receiving UMTA grants to make "fair and equitable arrangements ... as determined by the Secretary of Labor ... to protect the interests of employees affected by such assistance." These 'arrangements' generally take the form of what are known as § 13(c) agreements, executed by the transit agency and the union local, and approved by the Secretary of Labor. The last § 13(c) agreement between plaintiff and defendant was signed on February 14, 1977. Exhibit A to plaintiff's complaint. It was most recently incorporated by refer-

---

1. Local 732 also seeks liquidated damages, punitive damages and an award of attorney's fees pursuant to 42 U.S.C. § 1988. Complaint, page 8.

ence into an UMTA grant to MARTA in June, 1981. *See* correspondence comprising Exhibit B to the complaint.

4. The § 13(c) agreement in effect between the parties contains, among others, the following conditions:

(2) All rights, privileges and benefits (including pension rights and benefits) of employees covered by this agreement (including employees having already retired) under existing collective bargaining agreements or otherwise, shall be preserved and continued, unless by collective bargaining and agreement of both parties hereto other arrangements are made; provided, however, that any such agreement or arrangements shall not be inconsistent either with this agreement or with the requirements of Section 13(c) of the Act as determined by the Secretary of Labor.

(20) In case of any labor dispute or controversy regarding the application, interpretation, or enforcement of any of the provisions of this Agreement which cannot be settled by collective bargaining within sixty (60) days after the dispute or controversy first arises, such dispute or controversy may be submitted at the written request of either party hereto to a board of arbitration as hereinafter provided. [The binding arbitration procedure is set forth.] The decision by majority vote of the arbitration board shall be final, binding and conclusive: *all contract conditions shall remain undisturbed*, there shall be no lock-outs, strikes, walk-outs or interference with or interruption of MARTA operations during the arbitration proceedings or to upset the award.

.  .  .  .  .

The term "labor dispute," for the purposes of this paragraph, shall be broadly construed and shall include, but not be limited to, any controversy concerning wages, salaries, hours, working conditions, or benefits, including health and welfare, sick leave, insurance, or pension or retirement provisions, any differences or questions that may arise between the parties, including the making or main-taining of collective bargaining agreements, the terms to be included in such agreements, or any grievances that may arise, and any controversy arising out of or by virtue of any of the provisions of this agreement for the protection of employees affected by the Project.

Emphasis added.

5. Plaintiff has invoked the binding arbitration procedure of paragraph (20) of the § 13(c) agreement, *see* Exhibit C to the complaint, and the parties are now choosing members of the arbitration board. Neither side has objected in this action to submitting to "interest arbitration," that is, the arbitration of the terms of an entire new labor agreement.

6. Plaintiff invoked this arbitration procedure just prior to the expiration of the labor agreement on June 27, 1981. The expired labor agreement provided, in pertinent part:

148. This agreement shall continue in force from June 28, 1978, through June 27, 1981, and from year to year thereafter until either party notifies the other party not less than sixty (60) days prior to the expiration of this agreement, or each extension thereof, of the desire to terminate this agreement or to negotiate changes, modifications or additions thereto.

149. If the notice is to negotiate changes, modifications, or additions, this agreement shall remain in effect until the final completion of the negotiations.

7. The expired labor agreement provided for quarterly cost of living allowances as follows:

144. The basic wage rates as contained in this Agreement shall not be reduced by application of this Cost of Living Provision. In addition to those rates, all employees covered by this Agreement shall be granted a Cost of Living Allowance (COLA) in accordance with the change, if any, in the Revised Consumer Price Index for Urban Wage Earners and Clerical Workers (CPIW), U. S. City Average (1967 = 100), published by the Bureau of Labor Statistics, U. S. Department of Labor, or in such Index as

the Bureau of Labor Statistics may hereafter develop to replace the present Index.

145. The Index for March 1978 (189.7), shall be the Base Index and the COLA shall be in the amount of one cent per hour applied to the top operator's hourly rate for each full three tenths (0.3) of a point increase over the Base Index. The COLA, if any, will be effective with the first payroll period that commences after the June 1978 index is published and shall be based on the increase, if any, in the Consumer Price Index for June, 1978 over the Base Index. Eleven additional quarterly COLA's shall be made thereafter in the same manner in relation to the Base Index. The final COLA shall become payable on the first payroll period that commences after the March 1981 Index is published.

146. The COLA resulting from the foregoing will serve to adjust the top operator's hourly rate.

. . . . .

The resulting COLA shall be used in the computation of straight time and overtime pay exactly as though the wage rates had been increased by the allowance. However, the COLA shall not be added to the basic wage rates but only to each employee's earnings.

8. By letter to plaintiff dated June 25, 1981, Exhibit D to the complaint, MARTA indicated that it would not pay any COLA after the expiration of the labor agreement. The present suit followed.

9. Individual members of plaintiff Local 732 will be greatly harmed if an injunction is not issued in this case. If defendant does not continue to pay employees their COLAs, employees will have their paychecks reduced by approximately one-quarter. This reduction in salary would continue until interest arbitration is completed, which may take six months or longer.

10. Plaintiff Local 732 will also be greatly harmed, in that its bargaining position, in both interest arbitration and in collective bargaining outside of arbitration, will be undermined. The gains in pay for union members over the last three year contract will be nullified. Moreover, the economic pressure on plaintiff's members due to their reduced pay, will necessarily sap plaintiff's strength in negotiations; plaintiff may be forced into a quick settlement not in the best interests of its members. This is harm of an irreparable nature; lost bargaining opportunities may never be recouped. Moreover, failure to grant injunctive relief will give defendant MARTA a considerable incentive to procrastinate to the extent possible.

11. The granting of plaintiff's motion for a preliminary injunction would injure defendant MARTA in two respects. First, MARTA's bargaining position would be weakened somewhat; if the injunction is granted, plaintiff will likely begin discussions by proposing that the basic wage adjusted by the COLAs of the expired contract become the basic wage of the new contract. Second, the granting of an injunction would cost MARTA the COLA payments until interest arbitration was concluded, or until collective bargaining bore fruit. But COLA payments are something MARTA agreed to make to its covered employees, and has succeeded in coping with for three years.[2] The Court concludes that the slight harm to defendant in granting plaintiff's motion is greatly outweighed by the irreparable harm suffered by the union and some of its members.

12. An injunction will not disserve the public interest. It is true that an injunction *may* result in a fare hike. But the public's interest in labor harmony and in the sort of reliable, quality public transportation MARTA has provided in the past and will doubtless continue to provide, outweighs the harm from a slight fare hike.

2. The Court notes that while basic wage rates will be set during arbitration, it is unrealistic to expect that they will be closer to the June 28, 1978 levels than to the COLA-adjusted levels of June 27, 1981. To the extent the injunction is not granted, MARTA will realize a substantial saving in its labor costs until arbitration is concluded.

13. The parol evidence admitted without objection at the hearing on Friday, July 10, as to what the parties *intended* concerning the issue in this case, was in conflict. MARTA's witness, Mr. Thomas O. Duvall, testified that it was MARTA's understanding that the COLA payments would cease at the expiration of the labor agreement if interest arbitration were invoked. The union's witness, Mr. Ralph Green, testified that the union understood that it would receive all COLA payments during arbitration, but that no new additional quarterly adjustments would be made until a new agreement was reached. The witnesses agreed that the invariable *practice* was for MARTA employees to receive COLA payments during the arbitration or negotiation period. As the testimony was inconclusive in establishing the intent of the parties, the Court did not consider this testimony in reaching its decision.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction to hear actions of this sort pursuant to 28 U.S.C. § 1331. *Division 1287, Amalgamated Transit Union v. Kansas City Area Transportation Authority*, 582 F.2d 444, 448–50 (8th Cir. 1978); *Local Division 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility*, 585 F.2d 1340, 1344–48 (7th Cir. 1978); *Local Division No. 714, Amalgamated Transit Union v. Greater Portland Transit District of Portland, Maine*, 589 F.2d 1, 5–8 (1st Cir. 1978); and *Local Division 1285, Amalgamated Transit Union v. Jackson Transit Authority*, 650 F.2d 1379 at pages 1381–84 (6th Cir. 1981).

2. Plaintiff's complaint seeking to enforce its § 13(c) agreement with defendant MARTA states a federal cause of action, whether implied from § 13(c) of the Urban Mass Transportation Act, 49 U.S.C. § 1609(c), *see Portland, supra*, 589 F.2d at 11–16; *LaCrosse, supra*, 585 F.2d at 1349–50; *Jackson, supra*, pages 1383–87, or from

42 U.S.C. § 1983. *See Local Division 732, Amalgamated Transit Union v. Metropolitan Atlanta Rapid Transit Authority*, C81–774A (N.D.Ga., June 24, 1981) (Evans, J.).

3. In order to succeed on a motion for a preliminary injunction in this circuit, plaintiff must carry its burden of persuasion as to each of four prerequisites. Plaintiff must establish

(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

4. *Substantial likelihood of success on the merits.* Plaintiff has clearly carried its burden of showing likely success on the merits.

(a) As noted above, the four circuit courts that have ruled on cases involving suits brought by unions to enforce § 13(c) agreements have concluded that federal question jurisdiction exists in the federal district courts, and that such suits state a federal cause of action. *See* Conclusions of Law # # 1 and 2, above. The one circuit court to consider the question of standing concluded that another union local of the Amalgamated Transit Union had standing to sue "in its representative capacity to vindicate the rights of employees to binding interest arbitration under the collective § 13(c) protective arrangements." *Portland, supra*, 589 F.2d at 9.

(b) It is likely that the preliminary injunction issued on July 10, 1981, would become permanent after a full trial on the merits. The § 13(c) agreement[3] between the parties requires that, pending the inter-

---

**3.** Defendant argued briefly that insofar as the terms of § 13(c) agreement and the labor agreement vary, the provisions of the latter should prevail. This view is incorrect. The Eighth Circuit said in the *Kansas City* case, *supra*, that

"this suit is based on the § 13(c) agreement, and the rights of the parties must be measured by that agreement which is not identical in terms to the collective bargaining agreement." 582 F.2d at 451.

est arbitration now in progress, "all contract conditions shall remain undisturbed." The federal district courts which have been asked by union locals to keep transit agencies from disturbing any contract conditions have taken a practical approach to preserving the status quo. This is consistent with the purposes of § 13(c) of UMTA, "to protect the interests of employees," and to protect "individual employees against a worsening of their positions with respect to their employment." There is no doubt that discontinuing COLA payments would result in a substantial worsening of the position of MARTA employees.

(i) In *Division 1309, Amalgamated Transit Union v. San Diego Transit Corporation*, Civil No. 78–1093E (S.D.Cal., Jan. 9, 1979), defendant sought to make unilateral changes in the conditions of employment after the collective bargaining agreement expired. The union contended that defendant planned to reduce wages 20–30%, to change the rules concerning shift selection, seniority and the hiring of part-time employees, and to reduce sick leave benefits. The court granted plaintiff's motion for a preliminary injunction "preserving and continuing all rights and benefits of employment until a new collective bargaining agreement can be concluded between the parties," and noted that plaintiff's success on the merits was "probable".

(ii) In *Division No. 1177, Amalgamated Transit Union v. Tidewater Transportation District Commission*, Civil Action No. 79–968–N (E.D.Va., Nov. 8, 1979 and Dec. 7, 1979), defendant threatened, after an impasse in bargaining, to unilaterally implement its final offer to the union. A temporary restraining order issued. The court said that a "change from the status quo pending [a hearing on plaintiff's request for a preliminary injunction] and our decision on the questions raised would be disruptive of the present equilibrium between the parties. If we temporarily freeze the status quo, the defendants will suffer no hardship, other than the loss [sic] opportunity to pressure the plaintiff union into accepting its bargaining position." After the temporary restraining order expired, but before the

hearing on plaintiff's request for a preliminary injunction, defendant indicated that it would preserve the status quo except that it would discontinue union dues checkoff, and that it would not implement an automatic wage and benefit increase due prior to the hearing. The court again enjoined defendant.

In this case maintaining the status quo is to continue in effect all the provisions of the labor contract which expired September 30, 1979. This includes the quarterly automatic cost of living adjustments.

The defendants are hereby ENJOINED, until the further order of this Court, from altering in any way the wages, benefits, terms and conditions of employment as set forth in the collective bargaining agreement entered into between the parties, with a termination date of September 30, 1979, including, but not limited to, the obligation to pay the cost of living increases quarterly.

(iii) In *Division 1287, Amalgamated Transit Union v. Kansas City Area Transportation Authority*, 485 F.Supp. 856 (W.D. Mo., 1978), *aff'd*, 582 F.2d 444, *cert. den.* 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56, defendant agreed to maintain the status quo pending the decision of the district court and to refrain from making its proposed unilateral changes. *See* Finding of Fact # 66. Nonetheless, the judge in *Kansas City* ordered as part of the relief granted that "the parties shall maintain the status quo so far as this litigation is concerned."

(iv) *Local Division 589, Amalgamated Transit Union v. Commonwealth of Massachusetts, et al.*, 511 F.Supp. 312 (D.Mass. 1981), is the only case which provides defendant here with any support for its position, and that support is marginal. To the extent that the Boston decision does support defendant here, this Court is of the opinion it is incorrect.

Plaintiff union sought declaratory and injunctive relief against defendant Massachusetts and the Massachusetts Bay Transportation Authority. In pertinent part, the

union sought under the § 13(c) agreement to force the Authority (MBTA) to proceed to interest arbitration, and to prevent MBTA from a planned layoff of 500 union members. The court required MBTA and the union to proceed to interest arbitration, but declined to enjoin MBTA from the proposed layoffs.

The court in *Massachusetts*, noting that the labor agreement provided for no layoffs, other than for temporary employees, "up to and including December 31, 1980," concluded that employee job security expired on that date. The district judge rejected the suggestion that

> some generalized obligation of fairness under section 13(c) of UMTA prevents the MBTA from utilizing the breakdown of collective bargaining and the resulting extended hiatus in employment security to accomplish the proposed layoffs. The contract provision was negotiated between the parties, and I perceive no legal or equitable basis for relieving the Union of a tough bargain any more than I see a basis for relieving the MBTA of a number of tough contract provisions upon which the Unions insist.

511 F.Supp. at 320. But job security was clearly a condition of the contract for the employees, which under the § 13(c) should have remained undisturbed. No doubt in Boston, as in Atlanta, the labor agreement contained a number of terms with expiration dates. *See, e. g.*, Plaintiff's Exhibit 2, ¶¶ 69, 148, and all exhibits. A realistic appraisal of contract conditions, in light of § 13(c) of UMTA and the § 13(c) agreement, compels the conclusion that job security for certain employees was a contract condition which should have remained undisturbed.

The Boston court did acknowledge the following, and indicate that it *might* enter the requested injunction.

> There is precedent in labor law, however, for maintaining the status quo during arbitration, including interest arbitration. [Citations omitted.] If there were arbitration underway, and there were

some likelihood that a resolution of the controversy would occur with reasonable dispatch, the public interest might well be best served by a preliminary injunction. The layoffs and the resulting curtailment of services have been ordered unilaterally by the MBTA with minimal opportunity for consideration of other ways of reducing MBTA expenses to comply with the Advisory Board's budget.

> If I were advised before March 21, 1981 that arbitration between the MBTA and the Transit Union had commenced in accordance with this memorandum, I would consider enjoining the layoff of employees hired prior to August 8, 1979, but not otherwise.

To the extent that the *Massachusetts* court differed from other district courts in failing to maintain the status quo, however, it may be explained in terms of great factual distinctions from the other cases, and in terms of the broad discretion a judge has in fashioning preliminary injunctive relief. The *Massachusetts* case involved an entanglement of federal and state law, and a related case pending in the state court system. There was also an intervenor plaintiff union in the case. More important, however, the MBTA was on the verge of collapse due to lack of funds when the decision of Judge Skinner in *Massachusetts* was rendered. Thus the weighing of harm which the judge did in ruling on plaintiff union's application for a preliminary injunction weighed much more heavily in MBTA's favor than it did here in MARTA's favor. *See* Finding of Fact # 11, above.

What is more, MARTA's contention that the labor agreement at issue here provided for 12 COLA's and no more, and that the agreement embodies the parties' intent to roll wages for employees back to the basic wage rate during arbitration after June 27, 1981, finds little support in the language of the labor agreement. Such a provision could have been made clear by the addition of a single sentence. The words of the agreement contain no such provision.[4]

---

4. Nor is it very plausible that the union would actually have agreed to such a provision.

That being the case, contract conditions, that is, the status quo viewed in common sense fashion, must remain undisturbed. Based on its review of the pertinent authorities the Court concludes that plaintiff has shown a high probability of success on the merits.

■ 5. *Substantial threat of irreparable injury to plaintiff.* Plaintiff has carried its burden of showing a substantial likelihood of irreparable harm. *See* Findings of Fact 9–10. Similar harm was noted by the district court in *Tidewater.* "Under the hammer of the continually increasing cost of living and the delay of a new contract, employees if denied their small automatic cost of living increase due shortly may well be pressured into dropping their demands for arbitration and accepting Management's final offer which does include a pay raise. If in fact the Union has a right to arbitration, that right would be undermined." *Tidewater, supra,* December 7, 1979, at page three.

■ 6. *The threatened injury to plaintiff outweighs the threatened harm to defendant.* Plaintiff has carried its burden of showing this. *See* Findings of Fact 9–11. To the same effect is *Tidewater, supra,* December 7, 1979, at page four:

> The hardships in this case weigh heavily upon the plaintiff. If Management does not adjust for the automatic cost of living increases, then the employees may be economically and unfairly forced into a less favorable contract than would be the product of arbitration. On the other hand, if Management in the interim does adjust for the automatic cost of living increase and it is later determined that the employees were not so entitled, any added pay increment can be easily recouped.

The court in *San Diego, supra,* page seven, reached a similar conclusion:

> The balance of hardships tips sharply in plaintiff's favor. The preliminary injunction will be of limited duration. Yet the consequences to plaintiff of a salary cut and loss of benefits are much more difficult for it to bear than the concomitant

burden on defendant of continuing for a brief period longer a collective bargaining agreement to which it unquestionably agreed.

■ 7. *The public interest.* As previously noted, Finding of Fact # 12, the issuance of an injunction will not disserve the public interest.

8. Plaintiff union has met its burden under the *Canal Authority* case and shown that it is entitled to the extraordinary relief of a preliminary injunction to preserve the status quo, which must be carefully maintained to protect the value of fair arbitration. It is the Court's judgment, from the evidence, briefs and arguments presented in the case, that the employees had a reasonable expectation that their salaries would not be reduced during the arbitration period, and nothing in the expired contract persuades the Court otherwise. A realistic and practical assessment of the status quo on termination of the contract compels the conclusion that the payment condition of the contract was the basic wage, plus the COLA, found in every employee's paycheck at the time of termination. Had the parties intended the interpretation which MARTA insists upon, appropriate language could have been inserted in the labor agreement and this suit would have been unnecessary.

CONCLUSION

As the Court previously indicated, the cross-motions to disqualify counsel are DENIED.

Since the Court has concluded that the COLA payments are a contract condition within the meaning of paragraph 20 of the parties' § 13(c) agreement, and since plaintiff has shown that it is entitled to preliminary injunctive relief, defendant MARTA is hereby ENJOINED from withholding COLA payments at the levels existing on June 27, 1981, the last day of the contract. Pay levels shall remain at the June 27, 1981 level during the entire period of interest arbitration. This preliminary injunction shall expire at the earliest of (1) the effective date of a new labor agreement, wheth-

er reached by interest arbitration or by collective bargaining; (2) the entering of a final order and judgment in this action; or (3) a further order of this Court dissolving the injunction.

As a condition to the issuance of this preliminary injunction, the parties are each ORDERED to report in writing to this Court on the first day of each month, beginning August 1, 1981, on the progress of the arbitration. These reports should contain any complaints either party has concerning delay or misconduct in the interest arbitration. The Court will not hesitate to vacate this injunction if it determines that the plaintiff is delaying the arbitration procedure.

Bond as required by Fed.R.Civ.P. 65(c) is set at $2,000.00.